CASE NO. 14-3761 and 14-3798
_____

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

**ROBERT ZIK, APRIL ZIK, AND JAMES HEARON,**

Objectors/Appellants

v.

**GLOBAL FITNESS HOLDINGS, LLC,**

Defendant/Appellee

and

**AMBER GASCHO, ET AL.,**

Plaintiffs/Appellees

On Appeal from the United States District Court
for the Southern District of Ohio
_____

**Joint Brief of Appellants,
Robert Zik, April Zik, and James Hearon**

_____

Joshua T. Rose                          Gregory A. Belzley
Hummel Coan Miller Sage & Rose LLC      Belzley Bathurst Attorneys
239 South Fifth Street, Suite 1700                   P.O. Box 278
Louisville, Kentucky  40202-3268            Prospect, KY  40059
(502) 585-3084                                 502/292-2452
jrose@hcmsrlaw.com                         gbelzley@aol.com

*Counsel for Appellants, Robert Zik, April Zik, and James Hearon*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# And Financial Interest

Sixth Circuit
Case Number:  14-3761                    Case Name:  Gascho v. Global Fitness Holdings, LLC

Name of counsel:  Joshua T. Rose

Pursuant to 6th Cir. R. 26.1, Robert Zik, April Zik, and James Michael Hearon make the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

| |
|---|
| No. |

2.      Is there a publicly owned corporation, not a party to the appeal,  that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest: |

| |
|---|
| No. |

| CERTIFICATE OF SERVICE |
|---|
| I certify that on October 1, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.<br><br>s/Joshua T. Rose<br>Hummel Coan Miller Sage & Rose LLC<br>239 South Fifth Street, Suite 1700<br>Louisville, KY  40202-3268 |

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

i

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# And Financial Interest

Sixth Circuit
Case Number: 14-3761                    Case Name:  Gascho v. Global Fitness
Holdings, LLC

Name of counsel:  Gregory A. Belzley _____ _

Pursuant to 6th Cir. R. 26.1, Robert Zik, April Zik, and James Michael Hearon make the following
disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below
        the identity of the parent corporation or affiliate and the relationship between it and the
        named party:

| |
|---|
| No. |

2.      Is there a publicly owned corporation, not a party to the appeal,  that has a financial
        interest in the outcome?  If yes, list the identity of such corporation and the nature of the
        financial interest:

| |
|---|
| No. |

| CERTIFICATE OF SERVICE |
|---|
| I certify that on October 1, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.<br><br>s/Gregory A. Belzley _____ _<br>Belzley Bathurst Attorneys<br>P.O. Box 278<br>Prospect, KY  40059 |

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

ii

# **TABLE OF CONTENTS**

Corporate Disclosure Form ............................................................... i

Table of Authorities ..................................................................... v

Statement Regarding Oral Argument ........................................... 1

Jurisdictional Statement .............................................................. 1

Statement of Issues ..................................................................... 2

Statement of the Case.................................................................. 3

    I.    General Background ........................................................ 3

    II.   The Class Actions............................................................ 4

         A.  The Seeger Litigation.............................................. 4

         B.  The Zik Litigation .................................................. 4

         C.  The Gascho Litigation............................................ 5

         D.  The Tartaglia Litigation ......................................... 6

    III.  The Defeat of the Seeger Settlement ................................ 7

    IV.  The Proposed Settlement.................................................. 10

Summary of Argument ................................................................ 16

Argument..................................................................................... 20

    I.    Standard of Review......................................................... 20

    II.   Plaintiffs and their counsel failed to adequately protect the interests of the entire class, and the district court failed in its duty to rigorously analyze the classø claims and the settlement ...................................... 20

A.    Class counsel agreed to an unnecessary claims process that diluted the class payout by over 90% of the settled liability in order to secure fees equaling 60% of the payout ........................ 22

B.    Plaintiffs and their counsel failed to adequately protect the unique interests of the entire class ........................................................... 28

III.   Other factors show that the settlement is unfair to the class ............. 41

A.    Risk of Collusion .................................................................... 41

B.    The complexity, expense, duration, and likelihood of success on the merits of the litigation ...................................................... 45

C.    The opinions of Class counsel and Class representatives .......... 46

D.    The reaction of absent class members ....................................... 46

IV.   In the alternative, the Zik Objectors and their counsel should be awarded reasonable attorney fees and incentive awards, and Plaintiffsø counseløs attorney fee award should be reduced .............. 47

V.    Conclusion ..................................................................................... 54

Certificate of Compliance .......................................................................... 56

Certificate of Service ................................................................................. 57

VI.   Addendum Designating Joint Appendix Items ................................. 58

# TABLE OF AUTHORITIES

Amchem Products, Inc. v. Windsor,
521 U.S. 591 (1997)................................................................... 20

Bell Atlantic Corp. v. Bolger,
2 F.3d 1304 (3d Cir. 1993)......................................................... 47

Comcast Corp. v. Behrend,
133 S.Ct. 1426 (U.S. 2013)....................................................... 29,39

De Leon v. Bank of America, N.A.,
2012 WL 2568142 at *19-20 (M.D. Fla.)................................... 22,30,47

Dennis v. Kellog Co.,
697 F.3d 858 (9th Cir. 2012)..................................................... 53

Devlin v. Scardelletti,
536 U.S. 1 (2002)....................................................................... 1

In re Dry Max Pampers Litig.,
724 F.3d 71 (6th Cir. 2013)...................................................19,21,26

Eubank v. Pella Corp.,
753 F.3d 718 (7th Cir. 2014)............................ 16,21,22,23,29,35,47,48

In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.ơs Liab. Lit.,
55 F.3d 768 (3d Cir. 1995)................................... 21,28,38,46,47,52,53

Manners v. American Gen. Life Ins. Co.,
1999 WL 33581944 at *6, 20 (M.D. Tenn.) ............................... 22,48

New Hampshire v. Maine,
532 U.S. 742 (2001)................................................................. 43

Olden v. Gardner,
294 F. Appơx, 210 (6th Cir. 2008)............................................ 48

Pilgrim v. Universal Health Card, LLC,
660 F.3d 943 (6th Cir. 2011)..................................................... 8,34

Reynolds v. Beneficial Nat. Bank,
288 F.3d 277 (7th Cir. 2002) ............................................................ 38

Robins v. Global Fitness Holdings, LLC,
838 F.Supp. 631 (N.D. Ohio 2012) .............................................. 32,33

Sacred Heart Health Sys., Inc. v. Humana Military Heath Care Servs., Inc.,
601 F.3d 1159 (11th Cir. 2010) ....................................................... 30

Strong v. Bellsouth,
173 F.R.D. 167 (W.D. La. 1997) ..................................................... 53

UAW v. Gen. Motors Corp.,
497 F.3d 615 (6th Cir. 2007) .......................................................... 41

Wal-Mart Stores, Inc. v. Dukes,
131 S.Ct. 2541 (U.S. 2011) ............................................................ 29

Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,
396 F.3d 96 (2nd Cir. 2005) ....................................................... 29,52

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1332(d)(2)(A) ............................................................... 1

KRS § 367.170 ............................................................................ 5,34

KRS § 367.915 ................................................................................ 6

T.C.A. § 47-18-305 ........................................................................ 35

Fed. R. App. Proc. 4(a)(1)(A) ........................................................... 1

Fed. R. Civ. P. 23 ...................................................................... 19,20

Federal Judicial Center, Judgesø Class Action Notice and Claims Process
Checklist and Plain Language Guide, p. 6 ........................................ 22

## STATEMENT REGARDING ORAL ARGUMENT

Given the importance of the issues and complex procedural history involved in this appeal, Appellants respectfully request oral argument.


## JURISDICTIONAL STATEMENT

The case is a class action brought, *inter alia*, under state consumer fraud statutes and involving a multistate class of more than 600,000 class members. The district court had diversity jurisdiction of the case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A). This court has appellate jurisdiction because this is a timely-filed appeal from a final judgment under 28 U.S.C. § 1291. The district court's final judgment was entered on July 16, 2014. (Final Judgment, RE 148, Page ID #3015-3017). Objectors Robert J. Zik, April N. Zik, and James Michael Hearon ("the Zik Objectors") filed a timely notice of appeal under Fed. R. App. Proc. 4(a)(1)(A) on July 30, 2014. (Notice of Appeal, RE 149, Page ID #3018-19). As objectors, the Ziks and Mr. Hearon have standing to appeal a final approval of a class action settlement without the need to intervene in the case. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

## STATEMENT OF ISSUES

1. Did the Plaintiffs and their counsel adequately protect the interests of the entire class and was the settlement fair, given that Plaintiffs' counsel agreed to an unnecessary claims process that they knew would drastically reduce the payout to less than 10% of the settled liability in order to secure attorney fees representing 60% of the total payout?

2. Did Plaintiffs and their counsel adequately protect the interests of the entire class and all distinct groups within the class and was the settlement fair, given the gross disparity among the class' claims, including unique and valuable claims of the Zik Objectors and Kentucky class members for which no additional recovery was negotiated or awarded?

3. Did Plaintiffs or their counsel engage in collusion to settle the case without involving the Zik Objectors (or their counsel), particularly given the disparity between their respective claims, the history between the parties, and the representations and admissions of Plaintiffs' counsel?

4. Did the district court breach its duty to the class to rigorously scrutinize the fairness of the settlement and the class members' diverse claims, including their merits and amenability to certification?

2

5.      If the settlement is affirmed, should the Zik Objectors' and their counsel be compensated for undeniably providing a significant benefit to the class and/or should Plaintiffs' counsel's attorney fee award be reduced?

## STATEMENT OF THE CASE

### I.      General Background

Global Fitness Holdings, LLC d/b/a Urban Active ("Urban Active") owned and operated fitness centers in Kentucky, Ohio, Tennessee, North Carolina, Pennsylvania, Nebraska, and Georgia.  It originated and was headquartered in Kentucky.  The vast majority of the members of the Urban Active fitness centers were located in Kentucky and Ohio, and roughly one-third of the 605,735 proposed class members in the proceedings below were Kentucky residents.  (Urban Active Letters, RE 102, filed under seal).[1]

As set forth below, Urban Active engaged in a variety of illegitimate schemes, blatant breaches of contract, and corporate misconduct that cost hundreds of thousands of Urban Active members damages in the tens, hundreds and thousands of dollars, which likely earned Urban Active tens of millions of dollars.  Urban Active's conduct therefore spawned a number of class actions filed in state and federal courts in Kentucky and Ohio.

---

[1] The documents filed under seal do not have Page ID numbers.

3

## II.    The Class Actions.

### A.    The *Seeger* Litigation.

In 2009, Urban Active was sued in a putative class action by sixteen (16) of its current and former members in Boone County Circuit Court, Kentucky for a wide range of claims, including Urban Active illegally charging various types of membership and cancellation fees ranging from $10 to $787.60, refusing to cancel membership contracts, and forging contracts.    (Seeger Claim Summary and Amended Complaint, RE 118-12, Page ID #2031-2054). That lawsuit is styled *David Seeger, et. al. v. Global Fitness Holding, LLC*, Case No. 09-CI-3094, and is pending before the Honorable Judge Anthony Frohlich (the õ*Seeger*ö case).  (*Id.*). Although the settlement here would release the *Seeger* plaintiffsø claims, the *Seeger* plaintiffs and their counsel did not participate in this action or appeal, likely because of their self-serving and ultimately unsuccessful attempt to sell out the class via the *Seeger* settlement, as discussed below.

### B.    The *Zik* Litigation.

On February 2, 2011, the Zik Objectors brought their lawsuit against Urban Active in Jefferson County Circuit Court in Louisville, Kentucky on behalf of themselves and a class of hundreds of thousands of similarly situated persons. (Docket Sheet, RE 118-1, Page ID #1953-1956; Zik Second Amended Complaint, RE 118-2, Page ID #1957-1972).  The Zik Objectorsø claims are narrowly based on

Urban Active charging its "month-to-month" members two additional months' membership dues after Urban Active accepted and processed the membership cancellation, plus a $10 cancellation fee, in blatant violation of their written membership contracts and the Kentucky Consumer Protection Act, KRS §367.170, *et seq.* ("KCPA").  (*Id.*).  As fully discussed below, Robert and April Zik are the **only** named plaintiffs in any lawsuit whose contracts expressly preclude charging two additional month's membership dues after cancellation or a $10 cancellation fee, who were wrongfully charged such fees, and who prosecuted such claims on behalf of themselves and similarly situated persons (the "Zik Class").  The Zik Objectors were successful in remanding the case back to state court after Urban Active removed it to federal court, successfully defeated Urban Active's motion to dismiss on all counts, took significant written discovery and depositions, and were literally on the eve of class certification when first notified of the egregious and collusive settlement that is the subject of this appeal.  (Docket Sheet, RE 118-1, Page ID #1953-1956; Rose Declaration, RE 118-3, Page ID #1975-1977).

C.    The *Gascho* Litigation.

After the Zik Objectors filed suit, three of the plaintiffs in the case now before this Court (Amber Gascho, Ashley Buckenmeyer, and Michael Hogan) first brought suit against Urban Active in the Court of Common Pleas, Franklin County, Ohio, and the case was removed to the United States District Court, Southern District of

5

Ohio (the "*Gascho*" case).  (Amended Complaint, RE 5, Page ID #104-118).   Unlike the Zik Objectors' narrow and contractually-based post-cancellation claims, those plaintiffs alleged that Urban Active misrepresented contract terms when they joined the gym and failed to accept or process membership cancellations. (*Id.*). In August 2011, six more plaintiffs with widely divergent claims were added to the *Gascho* case, as more fully discussed below.  (Second Amended Complaint, RE 31, Page ID #357-385).  The *Gascho* Plaintiffs' claims arose from Urban Active's conduct *prior* to its processing cancellations and focused on three Ohio consumer protection statutes.  (*Id.*).

### D.    The *Tartaglia* Litigation.

On May 13, 2011, the *Gascho* Plaintiffs' counsel also brought suit in Boone County Circuit Court, Kentucky, on behalf of Albert Tartaglia and Michael Bell, who were ultimately added as Plaintiffs in *Gascho* case for settlement purposes. (Tartaglia Motion to Intervene, RE 118-11, Page ID #2007-2008). The case was styled *Tartaglia, et al. v. Global Fitness Holdings, LLC*, Case No. 11-CI-1121, and was assigned to Judge Frohlich who was already presiding over the *Seeger* case (the "*Tartaglia*" case).   The *Tartaglia* plaintiffs alleged that Urban Active violated Kentucky's Health Spa Act, KRS § 367.915 ("Health Spa Act"), *et. seq*., by selling memberships without disclosing less expensive membership plans that it had

registered with the Kentucky Attorney General, and that Urban Active failed to accept/process cancellations. (*Id.*).

## III.    The Defeat of the *Seeger* Settlement.

Those four cases independently proceeded with discovery until the summer of 2012 when Urban Active and *Seeger's* counsel persuaded Judge Frohlich (Boone County Circuit Court, Kentucky) to preliminarily approve a settlement releasing all claims of 242,243 Kentucky members without the knowledge or participation of Zik Objectors or Plaintiffs. (Rose Declaration, RE 118-3, Page ID #1974).   Zik Objectors and Plaintiffs intervened in *Seeger* to oppose the settlement. (*Id.*).  After the class was sent notice, claims were processed, discovery regarding the fairness was conducted, and a fairness hearing was held, Judge Frohlich unceremoniously rejected the settlement for numerous reasons that are also applicable here, including: (1) the proposed settlement and release being overly broad, because it included claims that did not share the identical factual predicates as plaintiffs' claims; and (2) class participation in the settlement being "dismal" due to an unnecessary claims process that resulted in a very low claims approval rate. (Seeger Order Rejecting Settlement, RE 118-10, Page ID #2000-2002).

Judge Frohlich concluded that:

[T]he beneficiaries of this settlement agreement is the defendant who receives a global release and Class Counsel who seeks a fee in the range of $250,00 to $300,000, as well as the representatives of the Class who are to receive $1,000 a piece…  These benefits are disproportionate to the benefits to be received by

7

the class.  The settlement is unfair in that too large a group of people are bound to an agreement for which little benefit is given.

(*Id.*).

The *Zik* case and the *Tartaglia* case were stayed pending final approval of the *Seeger* settlement for approximately seven (7) months ó from July 2012 through January 2013.  (Rose Declaration, RE 118-3, Page ID #1974).  During that time, Zik Objectorsø counsel and Plaintiffsø counsel worked closely together and vigorously to defeat the unfair *Seeger* settlement, including jointly drafting briefs, engaging in many strategy conferences, and participating in numerous hearings before Judge Frohlich, with Zik Objectorsø counsel typically leading the arguments.   (*Id.*).  Plaintiffsø lead counsel continually recognized the important differences between Zik Objectorsøclaims and Plaintiffsøclaims and that Plaintiffs were not pursuing the Zik Objectorsøclaims.  (*Id.*; Jan. 23 Email, RE 118-5, Page ID #1983; Feb. 12 Email, RE 118-5, Page ID #1982).   He also continually represented the significant differences between Plaintiffsø Kentucky and Ohio statutory consumer protection claims, and that the Kentucky Health Spa Act claims were the most valuable claims.  (Rose Declaration, RE 118-3, Page ID #1975, 1976).  Plaintiffsø lead counsel wrote:

> [W]e believe that the Ohio and Kentucky claims must remain separate for both class certification and settlement purposes.
> [*citing*] *Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943 (6th Cir. 2011) [differences in state consumer protection laws precluded certification]
> []

8

Given the requirements of the Kentucky Health Spa Act and the penalties that result from a violation, we stand a much better chance of recovering significant dollars and reaching LA Fitness[2] in Kentucky.

(Feb. 27 Email, RE 118-4, Page ID #1978).

Likewise, the *Tartaglia* plaintiffs devoted much of their objection to the *Seeger* settlement to *Seeger* counsel's failure to consider the purported great value of their Kentucky Health Spa Act claims, including the purported "high" likelihood of success on the merits and certification. (Tartaglia Plaintiffs' Objection to *Seeger* Settlement, RE 102, filed under seal, pp. 20-28). Plaintiffs' counsel represented to the *Seeger* court:

> [T]he cash value [being reimbursement of **one month's dues** per member under the Seeger settlement] **pales in comparison** to the statutory right of all members to void the contract *ab initio* and receive disgorgement as discussed in Objections 5, 6, and 7 below.

(*Id.*, p. 8)(Emphasis added.)

> Pursuant to the Kentucky Health Spa Act, damages would likely include all Global Fitness contracts [for Kentucky members] being declared null and void. This realization likely motivated Defendants to quickly seek a settlement with the Seeger Plaintiffs [] in hopes that Global Fitness could avoid the far greater damages that would be awarded to the Tartaglia Plaintiffs and the classes they represent.

(Tartaglia's Motion to Intervene in *Seeger*, RE 118-11, Page ID #2008-2009).

---

[2] "LA Fitness" was the entity to which Urban Active sold its fitness centers after the class actions were filed.

9

Plaintiffs' counsel also represented to Judge Frohlich that the Kentucky class' claims were worth "hundreds" if not "thousands" of "dollars" per person. (Video of August 16, 2012 Hearing at 2:08 p.m. and 2:34 p.m., RE 118, filed under seal). The Tartaglia plaintiffs likewise continually focused on the enormous purported value of the Kentucky Health Spa Act claims when conferencing with Zik Objectors' counsel and even characterized Tartaglia's Kentucky Health Spa Act claims as "his only claims." (Rose Declaration, RE 118-3, Page ID #1975-1976; Nov. 28 Email, RE 118-6, Page ID #1988).

The Tartaglia plaintiffs also argued that the *Seeger* settlement was unfair to the class, because no additional consideration was negotiated or received for the Kentucky Health Spa Act claims. (Tartaglia Plaintiffs' Objection to *Seeger* Settlement, RE 102, filed under seal, p. 28).

After the Zik Objectors and Tartaglia plaintiffs successfully defeated the *Seeger* settlement, Plaintiffs' counsel reiterated the importance of working together with the Zik Objectors' counsel to achieve the best result for the class:

> I strongly believe the class will benefit from both of our firms working together and avoiding what happened in the Seeger case.

(Jan. 23 Email, RE 118-5, Page ID #1983).

## IV.  The Proposed Settlement.

The Zik Objectors and Plaintiffs then proceeded toward certification of their unique claims. Certification in the Zik Objectors' case was fully and extensively

briefed, and a hearing was scheduled for September 16, 2013. (Rose Declaration, RE 118-3, Page ID #1975).[3] But on September 13, 2013, Zik Objectors' counsel were informed that Plaintiffs and Urban Active had just reached a settlement agreement that was secretly negotiated over many months, during which time the Zik Objectors' counsel were never notified or consulted in any fashion, despite the settlement purporting to release the Zik Objectors' unique and valuable claims. (*Id.*).

Despite Judge Frohlich's significant history with the case, including already presiding over a fairness hearing, and Plaintiffs' counsel's representation that the Kentucky and Ohio claims must remain separate for certification and settlement purposes, Plaintiffs then moved for preliminary approval of the settlement with the Ohio federal district court in *Gascho* and amended their complaint to add the Kentucky Plaintiffs to the action for settlement purposes. (Motion, RE 97, Page ID #1463-1614; Third Amended Complaint ("TAC"), RE 100, Page ID #1652-1684).

The settlement purported to release virtually every claim of all 606,246 members of Urban Active who signed gym and/or personal training contracts between January 1, 2006 through October 26, 2012 (the date Urban Active transferred ownership of the fitness centers and member contracts to LA Fitness), in exchange for class counsel receiving $2.39 million, Plaintiffs receiving $1,000-

---

[3] In the *Gascho* case, the Ohio Plaintiffs never moved for certification before settlement was reached, and the *Tartaglia* Plaintiffs' motion for certification was not even fully briefed, much less ready for hearing.

$5,000, and the class members having the *opportunity* to receive between $5-$75, with a minimum class payout of $1.3 million, despite the express acknowledgement that if all class members were paid the amounts set forth in the Settlement Agreement, the settlement payout (including attorney fees) would be over $19 million. (Settlement Agreement, RE 97-1, Page ID #1490-1493, 1496-1498).[4]

Under the proposed settlement, a class member could receive payment if he/she: (1) received and read the postcard or email notice; (2) recognized he/she was a class member; (3) took the time to request a claim form, despite potentially only being able to receive $5; (3) completed the form, including providing personal information; (4) verified it under penalty of perjury; and (5) submitted it by mail or online. (Postcard Notice, RE 97-8, Page ID #1590-1591; Claim Form, RE 97-2, Page ID #1526-1527). The Settlement Agreement specified the precise number of class and subclass members and required that Urban Active provide the identity and contact information (including addresses) of all class and subclass members to the settlement administrator. (Settlement Agreement, RE 97-1, Page ID #1497, 1502).

---

[4] The class was composed of a general class and three subclasses, which could overlap: (1) the "Class" included any member during the class period – $5 payment; (2) the "Gym Cancel Subclass" included any member who cancelled his/her gym membership during the class period – $20 payment; (3) the "Personal Training Cancel Subclass" included any member who cancelled his/her personal training contract during the class period - $30 payment; and (4) the "FIF Subclass" included any member who paid any facility improvement fee ("FIF") during the class period – $20 payment. (*Id.*, Page ID #1496-1497.)

12

Given the settlement's numerous red flags – including class counsel receiving almost **double** the minimum class payout, the unnecessary claims process, and the absence of any additional consideration for Kentucky class members or the Zik class – the Zik Objectors immediately moved to intervene in the *Gascho* action and attached a lengthy objection to *preliminary* approval of the settlement in order to have the Court closely scrutinize the settlement before the class incurred the significant expense and burden of class notice. (Zik Objectors' Motion to Intervene, RE 102, Page ID #1687-1764).

However, the district court denied the Zik Objectors' Motion to Intervene just five days after it was filed, without hearing or allowing any reply to the parties' response. (Order, RE 105, Page ID #1776; Order, RE 110, Page ID #1791). Plaintiffs objected to the motion and, ironically, argued the motion was untimely despite taking the exact opposite position with the *Seeger* court. (Plaintiffs' Opposition, RE 107, Page ID #1778-1783; Tartaglia Motion Intervene, RE 118-11, Page ID #2015). The district court ruled that the Zik motion was untimely and that the Zik Objectors could only challenge the settlement at the fairness hearing. (Order, RE 110, Page ID #1796). The district court's denial of intervention also precluded any discovery into the fairness of the settlement. (*Id.*).

On the same day that it denied intervention, the Court entered the proposed Preliminary Approval Order *tendered by Plaintiffs*, without considering Zik

13

Objectorsø objections or providing any independent opinion on the merits of preliminary approval. (Order, RE 111, Page ID #1808-1816). Plaintiffsø counsel also refused to provide the Zik Objectors (his purported clients given the preliminary approval order) any information regarding the settlement, although Plaintiffsø counsel pursued the same information in *Seeger* and despite his fiduciary duty to the Zik Objectors. (Rose Declaration, RE 118-3, Page ID #1976; Correspondence, RE 118-9, Page ID #1992-1999).

Notice was then sent to the class, but the results ó as in *Seeger* ó were predictably dismal. Only 55,597 of the 605,735 class members submitted claims and only 49,808 claims were approved, reflecting a mere 8.2% claims approval rate. (Dahl Declaration, RE 126, Page ID #2132-2137; Dahl Second Supplement, RE 140-1, Page ID #2798). The total class payout was $1,593,240, which equals a paltry **$2.63 member average** (i.e. $1,593,240 / 605,735 members).

The magistrate conducted a fairness hearing on February 13, 2014. (Transcript, RE 139, Page ID #2680-2792). Not one of the named representatives of the class or their counsel testified at the fairness hearing. (*Id.*). Only the settlement administrator, Mr. Jeffrey Dahl, took the stand to give sworn testimony, and he merely testified regarding the notice and claims tasks he was instructed to perform under the terms of the settlement. (*Id.*, Page ID #2701-2737). Mr. Dahl was not hired to design the claims process or determine if it was fair, and Plaintiffs

did not call any expert witness or other lay witness to support the settlement, much less an expert witness to discuss the value of the claims and fairness of the settlement related thereto.  (*Id.*, Page ID #2701-2737, Page ID #2723).  In fact, Plaintiffs failed to present **any** evidence of how the class' claims were valued or calculated, much less evidence justifying paying members with widely disparate claims the same paltry amounts.  (Transcript, RE 139, Page ID #2680-2792).

The Zik Objectors filed a lengthy and detailed objection to the settlement and a reply brief, and their counsel strenuously argued before the magistrate at the fairness hearing.  (Objection, RE 118, 1911-2063; Reply, RE 135, 2613-2653; Fairness Hearing transcript, RE 139, Page ID #2760-2773).

The magistrate nonetheless recommend that the settlement be approved.  (R&R, RE 141, Page ID #2799-2877).  However, the magistrate ignored, failed to analyze, and/or misconstrued many facts and issues raised by the Zik Objectors that are important to assessing the fairness of the settlement.  (*Id.*).  The district judge then affirmed the magistrate's Report and Recommendation in cursory fashion, without taking exception to, explaining, or expounding upon the reasoning of the report.  (Opinion, RE 146, Page ID #2996-3005).

## SUMMARY OF ARGUMENT

ōFrom the selfish standpoint of class counsel and the defendant, [] the optimal settlement is one modest in overall amount but heavily tilted toward attorneys' fees.ö *Eubank v. Pella Corp.,* 753 F.3d 718, 720 (7th Cir. 2014) (Posner, J.)  For this reason, intense judicial scrutiny and objector participation are extremely important to ensure fairness to the entire class and protect against preferential treatment of class counsel and certain members of the class.  *Id.* at 721.

Unfortunately, Plaintiffs and class counsel preferred themselves over the interests of the class, and the district court came woefully short in its fiduciary duty to intensely scrutinize the settlement.  As a result, Urban Active kept at least $15 million of its ill-gotten gains and receive an overbroad release of virtually all claims of every Urban Active member since January 1, 2006 (regardless of substance or value) at the average of **$2.63 per member**, with over 90% of the class receiving no compensation and class counsel receiving 60% of the payout.

First, the unnecessary claims process drastically diluted the agreed upon settled ōbenefitö to the class from over $17 million to roughly $1.6 million due to less than 10% of the class submitting claims. Urban Active admittedly possessed the information necessary (and the settlement administrator had the capability) to directly pay most class members without requiring that members obtain, complete, and submit claims forms under penalty of perjury.  It is irrefutable that class counsel

16

and Urban Active were well aware that more than 90% of the class would ultimately not be paid when they structured the settlement. The unnecessary claims process was merely a mechanism to create a fictive class õbenefitö in an attempt to justify an extremely egregious and overbroad settlement, including class counsel taking 60% of the payout. Plaintiffsø counsel offered absolutely no evidence that they even considered a direct payment mechanism without a claims process, much less offered evidence that a direct payment mechanism was analyzed or negotiated with an eye towards increasing the class payout in the best interests of the class.

Next, Plaintiffs did not adequately protect the interests of many groups of class members, including the Zik Class and the Kentucky class members. No Plaintiff possessed or pursued the unique claims of the Zik Class. Plaintiffsø counsel previously admitted and cannot deny the significant value of the Zik classø claims and their counseløs work. Unlike Plaintiffsø disparate claims and grossly overbroad class, the Zik Classøclaims were narrowly focused, highly likely to succeed on class certification and the merits, and sounded in Urban Active clearly breaching express contract terms. Plaintiffs cannot possibly settle and release claims they do not possess, much less adequately represent the Zik Class on such claims.

Plaintiffs also did not achieve any additional consideration for Kentucky membersø unique and purportedly immensely valuable Health Spa Act and KCPA claims. Further, the Kentucky members and other groups of class members with

17

widely divergent claims were not segregated into appropriate subclasses, adequately represented by distinct class representatives, or adequately compensated, as required by law.  Instead, 8.2% of them will receive the same paltry payouts.

Neither Plaintiffs nor the district court even attempted to explain or analyze the disparities of the classø claims (including the material differences between the consumer protection laws of the various states at issue), much less demonstrated with evidence that such disparities should not preclude settling such claims for the same prices.   In fact, Plaintiffs offered absolutely no evidence of how they determined or calculated the value of their claims and those of the class.

Plaintiffs also utterly failed to explain or reconcile (and the district court did not address) why their positions with the district court were drastically different than the positions their counsel previously took with the *Seeger* Court and the Zik Objectors.  Plaintiffsø counsel repeatedly represented to the *Seeger* Court and the Zik Objectors that Kentucky claims and Ohio claims must remain separate for class certification and settlement, that the Kentucky claims were immensely valuable and should be litigated in Kentucky to maximize that value, that the Zik Objectorsø claims (and their counseløs work) were unique and valuable, and that Plaintiffs and the Zik Objectors must work together to maximize the recovery ó as opposed to collusively settling like Plaintiffs did.

18

The settlement before this Court is based upon pure fiction in an attempt to justify an egregious result for the class, including, but not limited to: (1) the fiction that the class benefit is $17M; (2) the fiction that the claims process is necessary and in the best interest of the class; (3) the fiction that class counsel adequately represented the entire class; (4) the fiction that the subclass' claims are amenable to certification and settlement without further division into appropriate subclasses and adequate representation and compensation thereon; (5) the fiction that class counsel did not flip-flop and take opposite positions with the district court than he did with the *Seeger* court; and (6) the fiction that the Zik Objectors (and their counsel) provided no benefit to the class.

The reality is that the settlement provides Urban Active an overbroad release while paying class members an average of $2.63 each, provides class counsel with 60% of the payout ($2.39M), and provides the class representatives with up to 1,000 times a class member's monetary recovery.  "Cases are better decided on reality than fiction." *In re Dry Max Pampers Litig.,* 724 F.3d 713, 721 (6th Cir. 2013).

The Court should reject this egregious settlement to assure that Fed. R. Civ. P. 23 does not become a mechanism for laundering the profits of corporate misconduct from the class' hands and into the hands of class counsel.

# ARGUMENT

## I.      Standard of Review

This Court reviews the district court's certification of the class and approval of the settlement for an abuse of discretion. *Id.* at 717.

Given that settlement occurred prior to class certification, Plaintiffs have a heightened burden of proving that: (1) the proposed class (and subclasses) should be certified under Fed. R. Civ. P. 23; and (2) the settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e); *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

Our highest Court explained:

[T]hose [specifications of the Rule] designed to protect absentees by blocking unwarranted or overbroad class definitions [] demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

*Id.*

## II.     Plaintiffs and their counsel failed to adequately protect the interests of the entire class, and the district court failed in its duty to rigorously analyze the class' claims and the settlement.

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate."

20

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,* 55 F.3d 768, 785 (3d Cir. 1995). "[T]he law relies upon the 'fiduciary obligation[s]' of the class representatives and, especially, class counsel, to protect [the class'] interest," and "the courts must carefully scrutinize whether those fiduciary obligations have been met." *In re Dry Max Pampers Litig.,* 724 F.3d at 718.

Preferential treatment to class counsel, the class representatives, or certain groups of class members precludes fairness of the settlement. *Id.* "Such inequities in treatment make a settlement unfair." *Id.* "[T]he 'courts must be particularly vigilant' for 'subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.'" *Id.*

> The Court must be wary that class counsel does not sell out the class, because:

> The defendant cares only about the size of the settlement, not how it is divided between attorneys' fees and compensation for the class. From the selfish standpoint of class counsel and the defendant, therefore, the optimal settlement is one modest in overall amount but heavily tilted toward attorneys' fees—we and other courts have often remarked the incentive of class counsel, in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers—the deal that promotes the self-interest of both class counsel and the defendant and is therefore optimal from the standpoint of their private interests.

*Eubank v. Pella Corp.,* 753 F.3d 718, 720 (7th Cir. 2014) (Posner).

21

**A.    Class counsel agreed to an unnecessary claims process that diluted the class payout by over 90% of the settled liability in order to secure fees equaling 60% of the payout.**

The Federal Judicial Center warns that õ[i]n too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members.  **When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms.***" Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide,* p. 6 (emphasis added); *see also Manners v. American Gen. Life Ins. Co.,* 1999 WL 33581944 at *6, 20 (M.D. Tenn.) (100% of class members received $130M in settlement benefits without the necessity of having to submit a claim); *see also See De Leon v. Bank of America*, N.A., 2012 WL 2568142 at *19-20 (M.D. Fla.) (determining claims process was unnecessary).

In *Eubank, supra,* Judge Posner held that class counsel õsold out the classö by allowing the defendant to place restrictions on the claims process that would enormously reduce the class payout.  753 F.3d at 726.  In *Eubank,* plaintiffs represented the settlementøs value as $90M to the court, but Judge Posner determined that the actual class payout was likely to be less than $8.5M, given the claims process.  *Id.* at 723, 727.  Likewise, Judge Posner determined that defendant agreeing not to object to class counsel fees of 56% of the actual settlement value (as

opposed to the inflated potential value) indicated that defendant "induce[d] class counsel to settle the case on terms that would minimize [defendant's] overall liability." *Id.* at 727.

Similar to the *Eubank* settlement, here, the $19M purported settlement value was a fiction used to justify excessive attorney fees of $2.39M and demonstrates that Urban Active induced class counsel to accept a poor settlement (including an unnecessary claims process) in exchange for attorney fees amounting to 60% of the actual settlement value.

The parties do not dispute that Urban Active possesses (and provided to the settlement administrator) the data necessary to determine who is a member of the class and subclasses and thus entitled to payment. (Settlement Agreement, RE 97-1, Page ID #1497, 1502). It is also undisputed that only 8.2% of claims were approved (49,808 Class members), leaving 555,927 Class members without any recovery. (Dahl's Second Supplemental Declaration, RE 140-1, Page ID #2798). Likewise, the class will receive only $1,593,240 (8.2%) of the purported settled liability of Urban Active of $19,390,515. (*Id.*).

Class counsel seeks to receive $2,390,000 – over 60% of the payout – and Urban Active keeps the rest, while over 90% of the class will not receive money to which they are purportedly entitled.

Despite these obvious inequities, the district court (in one paragraph) determined that the claims process was appropriate because: (a) although Mr. Dahl, the settlement administrator, "testified that '90.08 percent of the Postcard Notices were delivered,' he clarified that there is 'no way of definitively saying they actually reached the class member'"; and (b) "there was testimony that the data [i.e. the member addresses] was outdated and unreliable." (Opinion, RE 146, Page ID #3001). Although the district court did not provide any explanation, its statement infers that submitting claims was necessary because direct payments may be received and deposited by persons who are not class members.

However, Mr. Dahl never testified that the class members' addresses were unreliable or that more than 10% of the postcard notices did not reach the actual class members. In contrast, he testified that he took significant measures to assure that the mailed postcard notice reached over 90% of the Class:

> I mean, you know, typically, we measure notice in terms of reaching frequency. That's what percentage of the class we reach… We would provide direct mail notice to the class. You know, we get some return mail. So, we would retrace or re-mail, and we would expect to hit, you know, 90 percent or 90 percent plus based on that. So, in terms of reaching frequency, we would reach 90 percent of the class one time.

(Fairness Hearing Transcript, RE 139, Page ID #2704).

Mr. Dahl's initial efforts included: (1) standardizing the addresses; (2) scrubbing the addresses for abnormalities; and (3) updating addresses through the National Address Database, which would provide a new address for any member

who moved locations and notified the post office of his/her new address within the last four (4) years. (*Id.*, Page ID #2715-2718).

After the above measures were taken, notice was mailed to the Class. Of the 601,494 notices mailed to class members, 144,540 were returned without a forwarding address. (Dahl Declaration, RE 126-1, Page ID #2154). Of the 144,540 returned notices, Mr. Dahl testified that he was able to locate a õbetterö and more reliable address for 89,198 of the class members by using a third party provider who researches address history and other information to determine the current addresses of the class members. (Fairness Hearing Transcript, RE 139, Page ID #2718, 2719). At the end of the day, Mr. Dahl testified that the postcard notice reached 90.8% of the Class, assuming the post office actually delivered the notice. (*Id.*).

Plaintiffs presented no evidence that more than 10% of the postcard notices did not reach the class, what percentage above 10% did not reach the class, or which addresses or types of addresses (based on age or otherwise) were not reliable. Mr. Dahl did not testify at what age (if ever) addresses become too unreliable to assume that they are accurate or why. Mr. Dahl did not testify specifically how any aspect of the addresses may have caused addresses to be unreliable or to what extent. Mr. Dahl vaguely mentioned that consumer addresses may be less reliable that employee addresses, but he did not give any specifics in that regard. In fact, a fitness center

25

member is typically a member of a fitness center for many months (if not years) –
as opposed to consumers in many other class actions being one-time purchasers.

The fact that Mr. Dahl used a third-party service to find reliable addresses for
62% of the class members who initially had the least reliable addresses (i.e. those
who no longer lived at their prior address and left no forwarding address) clearly
shows that direct payments could have and should have been sent to the vast majority
of the class without requiring that claims be submitted.  At the very least, the law
requires that Urban Active directly pay claims to those members with reliable
addresses.

Plaintiffs offered no evidence that a direct payment mechanism (i.e. without
requiring a claims process), was even considered, much less analyzed or negotiated.
Plaintiffs offered absolutely no evidence that any risk or cost of a direct payment
procedure outweighed the enormous benefit to class members being able to deposit
checks without running the claims process.  It was Plaintiffs burden to prove the
fairness of their claims process, and they failed miserably in that regard.  *In re Dry
Max Pampers Litig.,* 724 F.3d at 719.

The reality (as confirmed by Mr. Dahl's testimony regarding typical claims
approval rates in consumer class actions) is that consumers are simply not motivated
to jump through hoops to possibly obtain a recovery as low as $5 and/or lack trust
or understanding of their claims or the process.  In order for the chance to receive as

little as $5, the class members must obtain a claims form, swear under penalty of perjury to events that occurred years prior, provide personal identifying information to a stranger who sent them a postcard, and submit the claim. It is not difficult to see why the response rates are so low, particularly given the abundance of junk mail, mail scams, identity theft, and the emerging marketplace of companies selling identifying information of people for profit. In contrast, the irrefutable reality is that consumers will deposit checks that are mailed to them.[5]

Urban Active and Plaintiffs (having both gone through the *Seeger* settlement administration and being counseled by their experienced class action attorneys) were well aware of these realities, which is why Urban Active only guaranteed a $1.3M payout to the Class (which equates to a 7.6% approval rate). (*Seeger* Settlement Administrator Affidavit, RE 108, filed under seal). It is obvious that Urban Active conditioned any settlement on a claims process to dilute the payout to less than 10% of Urban Active's settled liability. Plaintiffs and their counsel agreed to such a

---

[5] The magistrate also focused on Mr. Dahl's testimony that claims-made class settlements are generally more common than direct payment settlements and that claims approval rates in consumer class actions (where claims are required to be submitted) generally range between one and twelve percent of the class being paid. (R&R, RE 141, Page ID #2856-2860.) However, the fact that claims-made settlements may be common have no bearing upon whether or not such a mechanism was appropriate in this case. For example, when monetary recoveries are significant and facts in possession of the class member bear upon membership or recovery, a claims process may serve a purpose. Finally, the fact that claims approval rates in consumer class actions are low even further bolsters the principal that they should only be used ***when necessary***.

process to secure incentive awards and attorney fees that dwarfed the class payout, including class counsel rescuing its investment in a class action that was unlikely to be certified anywhere near as broadly as it was settled (if at all).

It was Plaintiffs' burden to prove why the claims process was necessary and fair, and they have fallen well short.

### B.    Plaintiffs and their counsel failed to adequately protect the unique interests of the entire class.

The district court cannot assume adequate representation, particularly "in a context where the potential for intra-class conflict further imperils the class's representation." *In re Gen. Motors Corp.,* 55 F.3d at 797.

Our Supreme Court explained that settling class representatives cannot adequately represent class members who have materially different claims by globally representing the entire class:

> The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency.
> []
> "[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.'

28

*Id.* at 627, 609 (groups of class members being exposed to different products, in different ways, over different time periods, and resulting in different injuries and damages required rejection of settlement); *see also Eubank v. Pella Corp,* 753 F.3d at 721.

Likewise, Plaintiffs cannot deny that class representatives can only release claims and conduct "aris[ing] out of the **identical factual predicate** as the settled conduct." (Tartaglia Objection to *Seeger* Settlement, RE 102, filed under seal, pp. 1-7)(*citing Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 107 (2nd Cir. 2005) (emphasis in original) (additional citations omitted).

"[T]he named plaintiff's claim and the class claims [must be] so interrelated that the interests of the class members will be fairly and adequately protected." *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2552 n.5 (U.S. 2011). "What matters to class certification ... is not the raising of common ¬questions'— even in droves— but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 2551.

The district court also had a duty to rigorously analyze the claims, including probing behind the allegations in the complaint and into the merits of the claims. *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (U.S. 2013). In *Comcast*, the Supreme Court expressed that the "permutations involving four theories of liability

29

and 2 million subscribers located in 16 counties are nearly endless" and precluded certification. *Id.* at 1434.

Plaintiffs and Urban Active attempt to sweepingly settle a wide range of disparate claims of all 605,735 former Urban Active members (including current LA Fitness members) for the same paltry prices via class representatives who did not adequately represent the unique and valuable claims of diverse groups within the class.

First, Plaintiffs failed to obtain **any** additional consideration for the Zik Objectors' (and the tens, if not hundreds, of thousands of those like them) unique and valuable claims or other Kentucky members with unique and valuable Kentucky Health Spa Act and KCPA claims.

To adequately represent and settle class members' breach of contract claims together (and for the same price), there must be a common, typical, and predominating answer to the core question of whether or not Urban Active had the right under the contracts to collect the charges.[6]

---

[6] "[C]laims of breach of contract are peculiarly driven by the terms of the parties' agreement, and common questions rarely will predominate if the relevant terms vary in substance among the contract." *De Leon*, 2012 WL 2568142 at *10-12 (M.D. Fla.) (rejecting settlement because contract terms varied among members) (quoting *Sacred Heart Health Sys., Inc. v. Humana Military Heath Care Servs., Inc.,* 601 F.3d 1159, 1171 (11th Cir. 2010).

The Ziks' membership contracts expressly precluded charging two additional months' dues (i.e. one month greater than expressly provided in the contract) post-cancellation or any $10 cancellation fee. (Zik Complaint, RE 118-2, Page ID #1958-1959, 1968, 1970; Urban Active Answer, RE 118-13, Page ID #2056).[7]    It is undisputed that the Ziks cancelled their memberships on December 29, 2009 and were charged membership dues of $49.99 each for January and February 2010 via direct withdrawal from their bank account. (*Id.*).[8]

The Ziks were also each charged a $10 cancellation fee by Urban Active. (Complaint, RE 118-2, Page ID #1959; Answer, RE 118-13, Page ID #2057). Robert Zik's Contract expressly does not provide for the $10 cancellation fee, yet he was

---

[7] The Ziks contracts read: "This month-to-month membership may then be cancelled with a 30 day written notice to Seller by certified mail, return receipt requested, or on the cancellation form provided at the Club location with said cancellation to become effective on the 1st of the next month following the expiration of this 30-day written notice." (*Id.*).

[8] Objector Hearon's contract is vague regarding Urban Active's right to charge the two additional months' dues, but the Hearon contract repeatedly and conspicuously calls the membership "month-to-month", and all ambiguities will be resolved against Urban Active. (Zik Complaint, RE 118-2, Page ID #1960, 1972). Urban Active began using the Hearon contract form around March 2008, and virtually all Urban Active contracts before that time used the cancellation language in the Ziks' contracts. (Parker Allen Dep., RE 102, filed under seal). Urban Active inexplicably moved to dismiss all of the Zik Objectors' claims and argued that the express terms of the membership agreements preclude Plaintiffs' claims, among various other reasons. However, the Court denied the motion to dismiss on all counts after extensive briefing. (Jefferson Circuit Court Docket Sheet, RE 118-1, Page ID #1953-1956).

charged the fee anyway.  (*Id.*; Reverse side of Zik Contract, RE 118-8, Page ID #1991).

Urban Active admitted in deposition that it charged **all** gym members the extra month's dues upon cancellation (i.e. the dues sought by the Zik Objectors) from at least June 2009 through June 2010.  (Devary Depo., RE 102, pp. 20, 21, filed under seal).  According to Urban Active's records, at least 86,569 gym members cancelled their memberships **in that one year time frame alone**.  (Spreadsheets, RE 102, filed under seal).

No Plaintiff possessed, much less adequately protected, pursued, or secured any additional recovery for the Zik Class' narrow, irrefutable, and valuable claims, which are ideally suited for class relief.[9]  In contrast, to the extent certain Plaintiffs' possessed any claims remotely similar to the Zik Class' claims, those claims were based on contracts purportedly providing that Urban Active could charge the extra month's dues and $10 cancellation fee, and such claims were dismissed by another district court in *Robins v. Global Fitness Holdings, LLC*, 838 F.Supp. 631, 640 (N.D. Ohio 2012) and not actively pursued by Plaintiffs.

_____

[9] No Plaintiff possessed a membership contract (like the Ziks) that precluded Urban Active charging the extra month's dues and the $10 cancellation fee and were charged either of such fees.  (TAC, RE 100, Page ID #1652-1684). Also, no Plaintiff cancelled his/her membership prior to July 2010 (the time period when Urban Active admittedly charged the extra month's dues upon cancellation), except for Anthony Meyer, whose claim is widely divergent from Zik Objectors' claims.  (TAC, RE 100, Page Id #1665-1666).

32

It is patently unfair for class members with irrefutable breach of contract claims to be provided the same monetary recovery as members with claims purportedly precluded by express contract terms, which were dismissed in *Robins*, *supra*. The Zik Objectors (and counsel) have spent over three years developing these unique and valuable claims on behalf of the subclass they seek to represent, and such claims should not be released without additional compensation.

Plaintiffs also did not secure **any** additional compensation for Kentucky class members who possessed unique and purportedly immensely valuable claims under Kentucky's Health Spa Act. Kentucky Plaintiffs' Health Spa Act claims were based on (among other violations) Urban Active selling memberships without disclosing the list of all available plans registered with the Kentucky Attorney General and that were more expensive than registered plans. As represented by Plaintiffs' counsel in *Seeger*, such claimants would be entitled to damages for all unregistered charges, which could be hundreds, if not thousands, of dollars each. For example, if a Kentucky member was charged $39.99 per month for his/her four (4) years of membership when the registered plan called for a charge of $29.99 per month, he/she would be entitled to damages of $480 ($10 per month) – whereas a member in another state would not possess any such claim and would be entitled to zero damages.

33

It is unfair for Ohio class members without any Health Spa Act claims to receive the same compensation (a chance to receive $5) as Kentucky members with claims of purported immense value. *See Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943, 947 (6th Cir. 2011) (material deviation among consumer laws of various states precluded class certification). Plaintiffsø counsel admitted as much in *Seeger.* (Feb. 27 Email, RE 118-4, Page ID #1978).

The settlement also fails to provide any compensation to Kentucky class members for KCPA claims that are outside of and in addition to the limited claims available to Ohio class members under the Ohio Consumer Sales Practices Act (õOCSPAö) and Ohio Prepaid Entertainment Contract Act (õOPECAö). Prior to the case being settled, the district court in *Gascho* ruled that Plaintiffsø OCSPA and OPECA claims are limited to Urban Activeøs alleged failure to inform members of a right to cancel, failure to provide the required notice of cancellation, and/or failure to honor a valid notice of cancellation. *Gascho v. Global Fitness Holdings, LLC,* 863 F.Supp.2d 677, 697 (S.D. Ohio 2012). In addition to Health Spa Act claims, Kentucky class members have the ability to assert KCPA violations for **any** õ[u]nfair, false, misleading, or deceptive act or practice,ö and Kentucky members have asserted many claims based on factual predicates falling outside the limited factual predicates actionable under OCSPA and OPECA, including claims governing wrongful FIFs and/or cancellation charges. KRS § 367.170; *Seeger*

34

Complaint, RE 118-12, Page ID #2031-2054; Zik Objectorsø Complaint, RE 118-2, Page ID #1957-1972; TAC, RE 100, Page ID #1652-1684.

Numerous other material differences exist between the consumer statutes of the various states where class members reside, including Tennessee law expressly precluding health clubs from charging any fees other than the monthly membership fee, including any cancellation fee or any FIF.  T.C.A. § 47-18-305.  Even the egregious settlement in *Eubank*, *supra*, contained separate subclasses for members in each state.  753 F.3d at 721.

In addition to Plaintiffs failing to adequately represent or secure additional compensation for the Zik Objectors and Kentucky members, Plaintiffsø claims are otherwise grossly disparate on liability and damages.  Yet, subclass members receive the same paltry payouts.

The multitude of disparities among Plaintiffsø claims are too numerous to fully discuss here, given the word-count limit of this brief, but we provide a few examples below and urge the Court to closely scrutinize Plaintiffsø claims.  (TAC, RE 100, Page ID #1652-1684).  For example, the FIF Subclass members who overcome the hurdles for claims approval will each receive $20 despite some members paying bi-annual $15 FIFs for years (and others paying only one $15 FIF), and despite some membersø written contracts including the right to charge the FIF and some membersø written contracts not including the right to charge a FIF.

Plaintiff Cary alleges that he was charged at least eight $15 FIFs (apparently with the FIF included in his contract but not disclosed when he signed up) (TAC, RE 100, Page #1675-1677), and Plaintiff Volkerding alleges he was charged numerous $15 FIFs despite the FIF not being in his contract (TAC, RE 100, Page #1674-1675). Reimbursements of FIFs to members, at the very least, must distinguish between members with FIFs in their contracts (and those without) and have some relation to the number of FIFs charged – not a blanket number of $20 for all members.[10]

Plaintiff Lundberg alleges he (and members similarly situated) "continue" to be double billed $42.69 per month for three years as a result of transferring his membership between two gym locations.  (TAC, RE 100, Page ID #1663-1664).  Mr. Lundberg's claims (like many Plaintiffs) are based on completely different factual and legal predicates than the other Plaintiffs (including three years of double billing) – yet he is lumped in with all other Plaintiffs as representing all class members, as opposed to representing a distinct subclass.

Plaintiff Meyer claims he was charged 4 extra months dues of $32.16 per month (total of $128.64) due to leaving for U.S. Navy boot camp, despite submitting a written cancellation form at the gym.  (TAC, RE 100, Page ID #1665-1666).  Urban Active's contracts contain precise terms regarding whether or not a geographic move

---

[10] Urban Active and Plaintiffs possess the records to show exactly how many FIFs each member was charged and whether or not the right to charge FIFs were included in the contract.

entitles a member to cancel.  Those similarly situated to Mr. Meyer (i.e. Urban Active¢s failure to process cancellations due to geographic move) will only receive $25, and their claims will vary widely in number of months charged and whether or not the geographic requirements were met.

Julia Cay f/k/a Julia Snyder alleges she was improperly charged a $250 õbuy-outö of her personal training contract, plus her $200 pre-paid last month¢s dues without receiving services for the last month, in contrast to representations of Urban Active, and that other class members are similarly situated.  (TAC, RE 100, Page ID #1669-1670).  Ms. Cay and her counsel apparently believe that a chance to receive $35 ($30 for Personal Training Cancel Subclass and $5 for general class) is just compensation for all of the following persons while Mrs. Cay receives $3,500 and her lawyers receive $2.39M: (1) those similarly situated as Ms. Cay (with $450 compensatory damages); (2) those similarly situated as Ms. Gascho and/or Ms. Buckenmeyer (whose claims vary and damages were not disclosed by Plaintiffs); (3) Personal Training Cancel Subclass members who have no viable claims or damages; and (4) Personal Training Cancel Subclass members who have varying membership rates, varying numbers of months of improperly charged dues, and various other complaints and potential claims under various state laws.

Also, the claims of Plaintiffs and class members who claim that Urban Active refused to allow them to cancel their memberships in person in the gym (and instead

required them to cancel via certified mail to the corporate office) or otherwise failed to process their cancellations, will vary on the merits of liability and number of months of overcharges.[11]

The court in *Reynolds v. Beneficial Nat.'l Bank* highlighted the conflict of interest between class members who only took out one or two defective loans and those who took out two or more loans when the compromised relief did not increase for members who took out two or more loans. 288 F.3d 277, 282 (7th Cir. 2002). Also, in *Reynolds*, two other potential subclasses of plaintiffs were õswept upö in the settlement without Plaintiffs adequately pursuing or achieving additional recovery for those claims, which further required rejection of the overbroad settlement. *Id.* at 285, 286.

The Court in *In re Gen. Motors Corp., supra,* held that the disparate value of the recoveries to members of the same class precluded adequacy of representation,

---

[11] For example, Plaintiffs allege that Urban Active instituted an egregious company-wide policy on October 1, 2010 to remove all cancellation forms from club locations and refused to accept in-club cancellations after that date in violation of member contracts, yet the Settlement does not distinguish between members cancelling before and after October 1, 2010. (Tartaglia Objection to *Seeger* Settlement, RE 102, filed under seal, pp. 17-19.) Plaintiffs even acknowledge that their õclaims are based on hundreds and (sic) thousands of individual consumer transactions which involved individual Class Members and thousands of different employees of Defendantö ó as opposed to the cohesive claims of the Zik Class that are based on Urban Active violating their own contracts in a uniform and largely irrefutable fashion. (Motion for Preliminary Approval, RE 97, Page ID #1474.)

and "[a]t the very least, the class should have been divided into sub-classes" to reflect the distinct values to the differing member groups.  55 F.3d at 801; *see also Comcast Corp.,* 133 S.Ct. at 1434 (the "permutations involving four theories of liability and 2 million subscribers located in 16 counties are nearly endless" and precluded certification).

Here, the district court failed to even remotely analyze the claims, much less rigorously analyze the disparity, value, and merits of Plaintiffs' and the class' claims to determine if the settlement is fair to all groups within the class.  The closest the court came to analyzing the claims was generally expressing that claims need not be "identical" to be certified and that "individual damage calculations do not preclude certification."  (Opinion, RE 146, Page ID #3003, 3004).  The magistrate also erred in failing to consider the merits of the disparate claims, because she determined that "regardless of which form contract the member signed, the Class Representatives allegedly suffered the same type of injury."  (Report, RE 141, Page ID #2821).  The magistrate clearly failed to appreciate that that terms of the contract will control whether or not there is a legally compensable injury, and that class members with valuable compensable injuries cannot be grouped with class members who do not possess any compensable injuries for settlement purposes.

Also, the magistrate patently erred when she determined that the Zik Objectors' claims were the same as Plaintiff Lundberg's claims.  (Report, RE 141,

39

Page ID #2820).  Actually, Plaintiff Lundberg's claims are inapposite to Zik Objectors' claims.  Mr. Lundberg **never** even cancelled his membership.  (TAC, RE 100, Page ID #1663-1664).  In March 2011, Mr. Lundberg "attempted" to transfer his membership between two Urban Active gym locations but the transfer was never affected, and he has "continually" been charged membership dues for two locations for over three years now.  (*Id.*).  Unlike the Zik Objectors, Mr. Lundberg did not bring a claim that he was charged membership dues for two months (instead of one month) **after his cancellation was affected** in violation of the express terms of his membership agreement.

Finally and quite astoundingly, the district court and the magistrate utterly failed to analyze the Kentucky Health Spa Act claims or other consumer protection statutes of the various states, except **merely** expressing that "KHSA and PECA contemplate rescission as a potential remedy." (Report, RE 141, Page ID #2846).

Plaintiffs failed to adequately protect many groups in the class, including the Zik Objectors and Kentucky members.  Plaintiffs' claims also vary widely amongst themselves and the class, yet they improperly all seek to jointly represent the entire class (including claims worth hundreds of dollars and claims worth nothing) for the same subclass prices.

The settlement is simply unfair to many groups within the class and is the result of class counsel and Plaintiffs preferring themselves over the class.  As a

result, Urban Active received the global release it was denied in *Seeger*, and

unfortunately, the district court failed in its duty to rigorously analyze the claims.

## III.    Other factors show that the settlement is unfair to the class.

When considering a settlement's fairness, this Court has considered other

factors, including: (1) the risk of fraud or collusion; (2) the complexity, expense and

likely duration of the litigation; (3) the likelihood of success on the merits; (5) the

opinions of class counsel and class representatives; (6) the reaction of absent class

members; and (7) the public interest. *UAW v. Gen. Motors Corp.,* 497 F.3d 615, 631

(6th Cir. 2007).

### A.    Risk of Collusion

Plaintiffs' counsel clearly engaged in collusion by secretly settling the class'

claims (including the Zik Objectors' claims), despite: (a) the extensive working

history between Plaintiffs' counsel and Zik Objectors' counsel for over seven

months in defeating the *Seeger* settlement; (b) Plaintiffs' counsel's representations

that it was necessary to work together with Zik Objectors' counsel going forward to

avoid what happened in *Seeger*; and (c) Plaintiffs' counsel acknowledging the

unique value of the Zik Objectors' claims, as opposed to the claims Plaintiffs  were

pursuing.   (Rose Declaration, RE 118-3, Page ID #1974-1976; Feb. 27 Email, RE 118-4, Page ID #1978; Feb. 12 Email, RE 118-5, Page ID #1982; Jan. 23 Email, RE 118-5, Page ID #1983).

The first step towards adequate representation of the Zik Class and away from collusion would have been to include the Zik Objectorsø counsel in the settlement discussions so that they (and the class they seek to represent) could be adequately represented and their claims could be either adequately settled or removed from the settlement.  Instead, Plaintiffsø counsel collusively excluded the Zik Objectors, so that they could settle the case on terms that would allow payment of $2.39M for their bulging fees.  In order to satisfy such a fee requirement within the realm of what Urban Active was apparently willing to pay, Plaintiffs had to cut out additional compensation for the Zik Objectors (and their counsel) and Kentucky members and cut out all compensation for over 90% of the class.  Due to their participation in the *Seeger* litigation, Plaintiffsøcounsel was well aware of the Zik Objectorsøopposition to an unnecessary claims process.

Plaintiffs should be judicially estopped from taking positions with the district court that are contrary to their positions in *Seeger*, or in any event, such contrary positions demonstrate Plaintiffsø collusion.   The doctrine of judicial estoppel õprevents a party  from  prevailing  in  one phase of a case on an argument and then

42

relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Its purpose is "to protect the integrity of the judicial process," "prevents parties from playing ='fast and loose with the courts'" and "prohibit[s] parties from deliberately changing positions according to the exigencies of the moment." *Id*. at 749, 750.

Plaintiffs' proposed settlement and positions here run directly contrary to their positions and representations to Judge Frohlich when objecting to the *Seeger* settlement as follows:

(1) Plaintiffs argued to Judge Frohlich that their Kentucky clients' claims were worth hundreds (if not thousands) of dollars each and that they were very likely to obtain certification and summary judgment on the merits. (Tartaglia Objection to *Seeger* Settlement, RE 102, filed under seal, pp. 8, 20-28; Tartaglia's Motion to Intervene, RE 118, Page ID #2008-2009; Video of August 16, 2012 Hearing at 2:08 p.m. and 2:34 p.m., RE 118, filed under seal). But Plaintiffs now attempt to settle such claims here for as low as 41 cents per member (8.2% of $5) and present doubt that their claims will succeed on the merits or be certified on a class-wide basis.

(2) Plaintiffs continually represented to Zik Objectors that their Kentucky Health Spa Act claims were their most valuable claims and that Kentucky claims and Ohio claims must remain separate for both certification and settlement, yet

43

Plaintiffs achieved no additional consideration in the settlement for Kentucky members' unique and purportedly valuable claims.  (Rose Declaration, RE 118-3, Page ID #1976; Nov. 28 Email, RE 118-6, Page ID #1988; Feb. 27 Email, RE 118-4, Page ID #1978).

(3)    Plaintiffs vigorously argued in *Seeger* that a class representative cannot release claims that do not share the *identical* factual predicates as his/her own claims. (Tartaglia Objection to Seeger Settlement, RE 102, pp. 1-7, filed under seal). Plaintiffs now overbroadly seek to release all claims "related" to their allegations, yet "specifically includ[ing]" all claims resulting from Urban Active's "sales, communications, contracting, billing, and/or cancellations of any gym or personal training contracts." (Settlement Agreement, RE 97-1, Page ID #1492-1493).

(4)    Plaintiffs opposed Zik Objectors' intervention and discovery in *Gascho*, despite Plaintiffs moving to intervene and taking the completely opposite positions in *Seeger*, including Plaintiffs arguing in *Seeger* that their motion was not untimely because there was no need to intervene until the parties in *Seeger* settled the case.  (Tartaglia Motion to Intervene, RE 118-11, Page ID #2014-2025; Objection to Motion to Intervene, RE 107, Page ID #1778, 1779).  The district court

44

denied Zik Objectors' motion to intervene after hearing Plaintiffs' objection.  (Order, RE 110, Page ID #1791-1796).[12]

The district court failed to even mention (much less address or closely scrutinize) the circumstances surrounding the collusive settlement or **any** of Plaintiffs' counsel's contrary prior positions and representations in *Seeger*. Plaintiffs' counsel's flip-flop is strong evidence of collusion.

### B.    The complexity, expense, duration, and likelihood of success on the merits of the litigation.

Plaintiffs failed to present any evidence describing the likelihood of success on the merits of their claims or the anticipated duration or expense of completing the litigation.  Plaintiffs failed to present any evidence describing or justifying their flip-flop on the merits of their claims, including previously representing to the *Seeger* court that they were likely to be awarded summary judgment.  Further, Plaintiffs failed to explain how their counsel had incurred fees in excess of $2.5M, on which claims those fees were spent, and how that expense furthered the merits of particular

---

[12] Plaintiffs' counsel likewise refused to provide the Zik Objectors (his purported clients after the district court preliminarily appointed him class counsel) any information regarding the settlement (including information regarding settlement value), despite Plaintiffs' counsel seeking such discovery in *Seeger* and despite his fiduciary duty to the Zik Objectors.  (Rose Declaration, RE 118-3, Page ID #1976; Correspondence, RE 118-9, Page ID #1992-1999.)

claims.  Regardless, the Zik Objectors' claims were highly likely to be certified and succeed on the merits, while incurring far less attorney fees.

### C.    The opinions of Class counsel and Class representatives

Plaintiffs failed to present any evidence (much less expert opinions) regarding the merits or value of their claims.   Plaintiffs, nor their counsel, testified at the fairness hearing.  The class representatives in this case will recover between $1,000 and $5,000, which is 200 to 1,000 times the minimal class payment of $5, and class counsel will receive 60% of the payout ($2.39M).  (Settlement Agreement, RE 97-1, Page ID #1498).

The district court should not have assumed that the class representatives or their counsel's support of the proposed settlement has anything to do with its merits beyond their own recovery, particularly given the other circumstances of the settlement and the lack of any testimony.

### D.    The reaction of absent class members

The Court should not infer support from silence, particularly when the payouts are small.  *See In re Gen. Motors Corp.,* 55 F.3d at 812.  Courts recognize and logic dictates that class members with small damages "have insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds

the objector's pro rata benefit." *Id.* (*citing Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1313 (3d Cir. 1993); *see also De Leon,* 2012 WL 2568142 at * 19 ($28 cash payment unlikely "to induce class members to submit a claim").  Further, "opting out of a class action is very rare," and studies have found average opt-out percentages to be less than one tenth of one percent.  *Eubanks,* 753 F.3d at 728.  The "vociferousness" and substance of objections is also relevant.  *See In re Gen. Motors Corp.,* 55 F.3d at 812.

The fact that more than 90% of the class did not fill out a claims form in order to receive between $5-$75 shows that the class does not understand and/or has not supported the settlement.  Please keep in mind that this was the second time many of the class members received a class action notice involving Urban Active – the first one being in the *Seeger* settlement.  Much of the class is likely confused and/or did not want to spend the time to obtain a claim form, provide personal identifying information to a stranger and/or verify information under penalty of perjury for the potential to receive a very small sum.

**IV.    In the alternative, the Zik Objectors and their counsel should be awarded reasonable attorney fees and incentive awards, and Plaintiffs' counsel's attorney fee award should be reduced.**

First and foremost, Zik Objectors and their counsel seek rejection of the settlement because it is unfair to the class.  However, in the alternative to outright

rejection of the settlement, they should be compensated for their significant effort, which has undoubtedly benefitted the class.

The participation of objectors in class action settlements is very important. *See Eubank,* 753 F.3d at 721. "Fees and costs may be awarded to counsel for objectors to a class action settlement if the work of counsel produced a beneficial result for the class." *Olden,* 294 F. App'x, 210, 221 (6th Cir. 2008); *see also Manners,* 1999 WL 33581944 at *32 (awarding $600,000 to objectors to be paid by defendant).

The district court denied Zik Objectors' fee request, because it erroneously found that the Zik Objectors did not provide "any benefit to the Class." (Opinion, RE 146, Page ID #3005). However, the undisputed evidence demonstrates that the Zik Objectors and their counsel produced a significant benefit to the class and should thus be compensated for their effort.

First, Zik Objectors' counsel's hard work for over seven months in having the *Seeger* settlement rejected was not only valuable to the class – it was a prerequisite to the Kentucky class members receiving any recovery. If the *Seeger* settlement were approved, approximately 200,000 Kentucky members of the class would have received virtually nothing as part of the *Seeger* settlement, yet their claims would have been released and barred from inclusion in this *Gascho* settlement or any other proceeding. (*Seeger* Order, RE 118-10, Page ID #2000-2002). Plaintiffs' counsel

and Zik Objectors' counsel worked closely together and vigorously to defeat the unfair *Seeger* settlement, including jointly drafting briefs, engaging in many strategy conferences, and participating in numerous hearings before the Judge. (Rose Declaration, RE 118-3, Page ID #1974). Zik Objectors' counsel in fact led the argument and witness examination at the *Seeger* fairness hearing. Plaintiffs did not contest these facts with the district court.

The district court awarded Plaintiffs' attorneys fees for their work in having the *Seeger* settlement rejected, because the work benefitted the class. The value of Zik Objectors' counsel's work in defeating the *Seeger* settlement was not and cannot be distinguished from the value of Plaintiffs' counsel's work (other than the Zik Objectors' taking the lead), and it is based on the same benefit to the class. Thus, the district court clearly abused its discretion in awarding attorney fees to Plaintiffs' counsel for defeating the *Seeger* settlement, yet denying an award to Zik Objectors' counsel for their work that produced the same class benefit.

Further, Zik Objectors litigating their case for over three years surely influenced Urban Active to settle, and Urban Active presented no evidence of its motivations to settle, much less evidence that the Zik Objectors' claims and procedural posture played no role in the settlement. The Zik Objectors filed their lawsuit before Plaintiffs, and unlike Plaintiffs, the Zik Objectors defeated Urban Active's motion to dismiss in full and defeated Urban Active's removal to federal

49

court.  (Rose Declaration, RE 118-3, Page ID #1977).  The Zik Objectors engaged in significant discovery, including being deposed and taking numerous depositions of Urban Active representatives.  (*Id.*).  Zik Objectors then moved for class certification, and their motion was on a much faster track that any class certification motion of Plaintiffs.  (*Id.*, Page ID #1975).  Plaintiffs and Urban Active reached the settlement two working days prior to Zik Objectors' class certification hearing.  (*Id.*).

Plaintiffs admitted the value that the Zik Objectors (and their counsel) brought to the table.  Plaintiffs' counsel and the Zik Objectors' counsel discussed their respective clients' claims being based on different factual predicates and theories, potentially joining forces, and a fair way to divide any recovery if forces were joined based on the disparity between and value of Plaintiffs' and Zik Objectors' respective claims.  (*Id.*; Feb. 27 Email, RE 118-4, Page ID #1978; Email String, RE 118-5, Page ID #1980-1985; Nov. 12 Email, RE 118-7, Page ID #1990).

Ultimately the Zik Objectors and Plaintiffs were not able to reach an agreement on combining forces, based in large part on the Zik Objectors' significant concern with the disparity among Plaintiffs' claims for certification purposes and their counsel's already enormous legal bills that could reduce the class' recovery.  (Rose Declaration, RE 118-3, Page ID #1975).  Recognizing the significant value in Zik Objectors' claims and its counsel's work, Plaintiffs' counsel's last offer was that Zik Objectors' counsel receive 40% of any recovery from the first $6M recovered

on behalf of Kentucky class members.  (Feb. 27 Email, RE 118-4, Page ID #1979).

Plaintiffs' lead counsel expressed:

> [W]e believe this [Plaintiffs' offer] properly balances the respective value we each bring to the table vis-à-vis our respective causes of action.

(Feb. 12 Email; RE 118-5, Page ID #1982).

> While both your claims and our claims have positives and negatives, we believe ours are more likely to be certified and more likely to succeed on the merits.
> []
> Last, I want to emphasize that I strongly believe the class will benefit from both of our firms working together and avoiding what happened in the Seeger case.  As we discussed in Cincinnati, the amount of money that can be recovered from Global Fitness is enough to fully compensate the class and both firms for the work put in.  We look forward to talking with you soon.  Thanks

(Jan. 23 Email; RE 118-5, Page ID #1983).[13]

Unfortunately and despite Plaintiffs' counsel's "strong belief" that they must work with Zik Objectors to obtain the best recovery for the class, Plaintiffs' counsel collusively settled without notice to the Zik Objectors' counsel.

_____

[13] Plaintiffs contend that Zik Objectors' attorney fees would equate to $382,400 if based on Plaintiffs' final offer to Zik Objectors before they collusively negotiated the settlement.  (Response to Objection, RE 128, Page ID #2293-2294.) Solely using the lodestar method and an hourly rate of $300 per hour (which is comparable to Plaintiffs' counsel's rate), Zik Objectors' attorney's fees would be $186,300, without considering additional time devoted to objecting to this settlement. (Rose Declaration, RE 118-3, Page ID #1977.)  In the alternative to outright rejection of the settlement and at the very least, Zik Objectors should be awarded reasonable attorney fees and incentive awards.

Shortly after Plaintiffs collusively settled this case, Plaintiffs made an opening offer to Zik Objectors' counsel of $150,000 as compensation for Zik Objectors' attorney fees.  (Rose Supplemental Declaration, RE 135-3, Page ID #2652)  Zik Objectors refused to make any counter-offer or negotiate the amount of any fees with Plaintiffs until Plaintiffs provided more information to Zik Objectors regarding the settlement and demonstrated that the settlement was in the best interest of the class. (*Id.*).  Plaintiffs even failed to provide Zik Objectors any information regarding the settlement, much less demonstrated its fairness.  (Correspondence, RE 118-9, Page ID #1992-1999).

Plaintiffs' offer further reflects their understanding and admission of the value and benefit that Zik Objectors and their counsel brought to the table.  The notion that Zik Objectors' work and progress in their case had no bearing on the settlement and benefit to the class defies logic and Plaintiffs' representations, and Zik Objectors work in defeating the *Seeger* settlement irrefutably benefitted the class.

Finally, attorney fees in this case should be based on or heavily tilted towards a percentage of recovery, as opposed to class counsel's lodestar.  *See In re Gen. Motors Corp.,* 55 F.3d at 821 ("private agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case"); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005) (the trend is towards a

percentage of recovery method, which õdirectly aligns the interests of the class and its counselö).

Interestingly, a large percentage of class counseløs work and large fees were purportedly devoted to electronic discovery to be used for the purpose of proving the Kentucky Health Spa Act claims ó claims for which no additional consideration was negotiated or received. (Nov. 12 Email, RE 118-7, Page ID #1990).

As discussed above, the purported class benefit of $17M is pure fiction ó the actual and expected class benefit is approximately $1.6M. The reality is also that Plaintiffs negotiated the payment of a common fund amounting to the class receiving an average of **$2.63 per member**. They did not win a statutory fee shifting case. The recovery is nowhere close to even compensating the class for breaches of contract, much less damages commensurate with consumer protection statutes, and Plaintiffs recovered zero dollars on their purportedly most valuable Kentucky Health Spa Act claims.

Thus, Plaintiffsø attorney fees equaling approximately 60% of the recovery is clearly excessive. *See In re Gen. Motors Corp.,* 55 F.3d at 821 (fee awards generally range from nineteen percent to forty-five percent of the settlement fund); *see also Dennis v. Kellog Co*., 697 F.3d 858, 868 (9th Cir. 2012) (after reducing the benefit by potentially fictitious amount, fee award of 38.9% of gross recovery was õclearlyö excessive); *Strong v. Bellsouth*, 173 F.R.D. 167, 172 (W.D. La. 1997)(õA request

for $6 million in attorneys' fees where counsel has provided no more than $2 million in benefits to the class is astonishing").

The class action mechanism and consumer protection laws are in place to ensure that consumers have an effective remedy against widespread consumer abuses. It would significantly frustrate (and certainly not further) consumer protection to award one group of attorneys 60% of a settled recovery to the complete exclusion of over 90% of the class and to the complete exclusion of counsel who vigorously and successfully pursued such settled claims for well over three years, particularly under the circumstances here. Such a result would chill attorneys from pursuing such cases in the best interests of the class and promote settlements that favor class counsel, the class representatives, and the defendant over the class. In turn, it would reward the first putative class counsel and representative (or in this case the second) willing to sell out the class. The Court should uphold the principles of class actions and consumer protection and reject this unfair settlement.

## V.   **CONCLUSION**

For the foregoing reasons, the Court should reverse the district court's approval of the settlement. In the alternative, the Court should award the Zik

Objectors' reasonable attorney fees and incentive awards and reduce Plaintiffs'

counsel's attorney fee award.

Respectfully submitted,

s/ Joshua T. Rose
Joshua T. Rose
Hummel Coan Miller Sage & Rose LLC
239 South Fifth Street, Suite 1700
Louisville, Kentucky  40202-3268
(502) 585-3084
jrose@hcmsrlaw.com

and

Gregory A. Belzley
Belzley Bathurst Attorneys
P.O. Box 278
Prospect, KY  40059
502/292-2452
gbelzley@aol.com

## <u>CERTIFICATE OF COMPLIANCE</u>

In compliance with FRAP 32(a)(7)(B) and (C), I certify that this Joint Final Brief contains 12,820 words according to the word count feature of Microsoft Word 2013, which was the word processing software used in the preparation of this Joint Brief of Appellants, Robert Zik, April Zik, and James Hearon.

<u>s/ Joshua T. Rose</u>    
Joshua T. Rose

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 1, 2014 I electronically filed the Joint Brief of Appellants, Robert Zik, April Zik, and James Hearon through the ECF system, which sent notice of electronic filing to all counsel of record.


s/ Joshua T. Rose
Joshua T. Rose

## VI.  ADDENDUM DESIGNATING JOINT APPENDIX ITEMS

| Description of Item | Record Entry Number | Page ID #(Range) |
|---|---|---|
| Current Docket Sheet of the District Court | n/a | |
| Gascho Amended Complaint | 5 | 104-118 |
| Gascho Second Amended Complaint | 31 | 357-385 |
| Joint Motion for Order Approving Class Action Settlement | 97 | 1463-1614 |
| Gascho Settlement Agreement | 97-1 | 1490-1493, 1496-1498, 1502 |
| Claim Form | 97-2 | 1526-1527 |
| Postcard Notice | 97-8 | 1590-1591 |
| Third Amended Complaint | 100 | 1652-1684 |
| Zik Objectorsø Motion to Intervene | 102 | 1687-1764 |
| Tartaglia Objection to Seeger Settlement | 102 | N/A, under seal |
| Devary Deposition | 102 | N/A, under seal |
| Spreadsheets | 102 | N/A, under seal |
| Parker Allen Depo | 102 | N/A, under seal |
| Ziksø Objection to Seeger Settlement | 102 | N/A, under seal |
| Urban Active Letters | 102 | N/A, under seal |
| Scheduling Order | 105 | 1776 |
| Plaintiffsø Memorandum in Opposition to Ziksø Motion to Intervene | 107 | 1778-1783 |

| Settlement Administrator Affidavit | 108 | N/A, under seal |
|---|---|---|
| Opinion and Order | 110 | 1791-1796 |
| Preliminary Approval Order | 111 | 1808-1816 |
| Objection to Class Action Settlement | 118 | 1911-2063 |
| Video of August 16, 2012 Hearing | 118 | N/A, under seal |
| Docket Sheet from Jefferson Circuit Court, Louisville, Kentucky | 118-1 | 1953-1956 |
| Zik Second Amended Complaint | 118-2 | 1957-1972 |
| Rose Declaration | 118-3 | 1974-1977 |
| February 27 Email | 118-4 | 1978, 1979 |
| Email string, including February 12 and January 23 Emails | 118-5 | 1980-1985 |
| November 28 Email | 118-6 | 1988 |
| November 12 Email | 118-7 | 1990 |
| Reverse Side of Zik Contract | 118-8 | 1991 |
| Correspondence | 118-9 | 1992-1999 |
| Seeger Order Rejecting Settlement | 118-10 | 2000-2002 |
| Tartaglia's Motion to Intervene in Seeger | 118-11 | 2008-2009, 2014-2025 |
| Seeger Claim Summary and Amended Complaint | 118-12 | 2031-2054 |
| Urban Active Answer | 118-13 | 2056, 2057 |
| Dahl Declaration | 126 | 2132-2137 |
| Dahl Declaration | 126-1 | 2154 |

| | | |
|---|---|---|
| Plaintiff's Response to Blackmon and Zik Objection | 128 | 2293-2294 |
| Reply in Support of Objection to Class Action Settlement | 135 | 2613-2653 |
| Rose Supplemental Declaration | 135-3 | 2652 |
| Transcript of Fairness Hearing | 139 | 2680-2792 |
| Dahl Second Supplement | 140-1 | 2798 |
| Report and Recommendation | 141 | 2799-2877 |
| Opinion and Order | 146 | 2996-3005 |
| Final Judgment | 148 | 3015-3017 |
| Notice of Appeal | 149 | 3018-3019 |